IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2008 JAN 23  PM 2: 01

CLERK US DIS...CT COURT
WESTERN DIST...CT OF TEXAS

BY_____
DEPUTY

| | | |
|---|---|---|
| ADVOCACY, INCORPORATED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | **A08CA071 LY** |
| | § | CIVIL ACTION NO._____ |
| ADELAIDE HORN, in her official capacity | § | |
| as the Commissioner of the Texas Department | § | |
| of Aging and Disability Services, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND MEMORANDUM OF LAW IN SUPPORT

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff respectfully files this

Motion for Preliminary Injunction and Memorandum of Law in Support, and states as follows:

1.     Plaintiff Advocacy, Incorporated ("Advocacy") moves this Court to enjoin the

Defendant, the Department of Aging and Disability Services (DADS), from continuing to deny

Advocacy access to peer review documents of R.G., and A.P, residents who recently died at its

facilities.  As will be shown below, Advocacy's authority to access these records and information are

mandated by federal statutory law.  Indeed, it is necessary for Advocacy to adequately fulfill its

statutory obligations to protect and advocate on behalf of individuals with disabilities and to

investigate incidents of abuse or neglect.  As Plaintiff meets the statutory requirements for record

access, as well as meeting the factors required for the issuance of injunctive relief, Plaintiff prays that

this Court will grant this motion and enter the requested preliminary injunction.

2.     Plaintiff asks this court to set this Motion for Preliminary Injunction for hearing at the

earliest possible date and, after hearing the request, issue a preliminary injunction against Defendant.

3.      As will be shown below, should the injunction be issued, Defendant will suffer no harm, pecuniary or otherwise.  Therefore, Plaintiff asks that if a bond is set, it be set at a minimum amount not to exceed One Hundred Dollars ($100.00).

## I.  STATEMENT OF FACTS

**A.      Protection and Advocacy Systems' Statutory Background**

Congress enacted three federal statutes[1], PADD, PAIMI and PAIR, after extensive congressional investigations into conditions affecting individuals with mental illness and developmental disabilities who were institutionalized in state facilities.[2]  In opening the hearings that led to the enactment of the PAIMI Act, Senator Weicker stated:

> We are here this morning to begin to give the American people and the Congress an opportunity to look over the walls of our Nation's public institutions for the mentally disabled.  Too often, as we will find out, the sight is a disgrace to us all.

*Senate Committee Report*, S. Hrg. No. 99-50, Pt. 1, at 1.

In enacting these statutes Congress expressly found that individuals "are vulnerable to abuse and serious injury" as well as "neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning." 42 U.S.C. § 10801(a)(1), (3).  Realizing that the fox cannot guard the hen house, Congress found that existing "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate. 42 U.S.C. § 10801(a)(4). *See also* S. Rep. No. 99-109, at 7 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1367.  Congress also recognized that other means of oversight - including

---

[1] The Protection and Advocacy for Persons with Developmental Disabilities Act ("PADD Act"); 42 U.S.C. § 15041, *et seq.,* the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"); 42 U.S.C. § 10801, *et seq.,* and the Protection and Advocacy for Individual Rights Act, 29 U.S.C. § 794c, *et seq.*

[2] *See* S. Rep. No. 99-109, at 2 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1362; *Examining the Issues Related to the Care and Treatment of the Nation's Institutionalized Mentally Disabled Persons: Joint Hearings Before the Comm. on Labor and Human Resources and the Subcomm. on Labor, Health and Human Services, Education, and Related Agencies of the Senate Comm. on Appropriations* ("*Senate Committee Report*"), S. Hrg. No. 99-50, Pt. II (1985) (Staff Report)

reviews by the federal Health Care Financing Administration and the Joint Commission on Accreditation of Hospitals (now the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO")) were inadequate to protect the needs of persons with mental illness who are institutionalized. S. Rep. No. 99-109, at 2-3, *reprinted in* 1986 U.S.C.C.A.N. 1361, 1362-63.

The first of the statutes to be enacted was the Protection and Advocacy for Persons with Developmental Disabilities Act ("PADD") in 1975 to protect the human and civil rights of this population after Congress learned of the inhumane and despicable conditions at New York's Willowbrook State School and other similar facilities. 42 U.S.C. § 6000 *et seq.*  As an integral component of the PADD Act, the Protection and Advocacy System was established to ensure that these protections became a reality. The 1975 PADD Act was repealed and replaced in its entirety with the PADD Act of 2000.  The Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), which was first enacted in 1986, is modeled after the PADD Act and provides parallel protections for persons with mental disabilities.[3] *See, e.g.,* 42 U.S.C. § 10803.  The Protection and Advocacy of Individuals' Rights ("PAIR") Program of the Rehabilitation Act, 29 U.S.C. § 794e, further extended the protection and advocacy mandate to protect the legal and human rights of individuals with disabilities who are ineligible for P&A services under either PAIMI, the PADD Act, or other protection and advocacy programs.  Under the PAIR statute, P&A systems are authorized to use the same mechanism under the PADD Act to serve persons with disabilities. 29 U.S.C. § 794e(f), 34 C.F.R. § 381.10. *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689 (D. Ariz. 2000).

Under the PADD Act, the PAIMI Act, and the PAIR Act, Congress provides significant

---

[3] *See, e.g.,* S. Rep. No. 109-99, 1st Sess. at 3 (1986); S. Rep. No. 113-100, 1st Sess. at 24 (1987), *reprinted in* 1987 U.S.C.A.A.N. 781, 803-04. Accordingly, courts' reasonings apply with equal force to both Acts. *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center*, 894 F. Supp. 424, 428 (M.D. Ala. 1995), *aff'd*, 97 F.3d 494, 494 (11th Cir. 1996).

system for persons with developmental disabilities and mental illnesses, and provides assurances that the P&A system will have the authority specified under 42 U.S.C. §§ 15043(a) and 10804. *See, e.g., Mississippi Protection & Advocacy System v. Cotton*, 929 F.2d 1054, 1055 (5th Cir. 1991); *Tarwater*, 97 F.3d at 494.   Texas has accepted these conditions by designating Advocacy as the federally mandated P&A system in Texas. (*See* Letter of Assurances, attached as Exhibit A, *see also* 25 T.A.C. § 404.155(b)(2)).

Under the Acts, Advocacy has the authority and the duty to investigate incidents of abuse and neglect of persons with disabilities if the incidents are reported to Advocacy or if Advocacy has probable cause to believe that the incidents occurred; and pursue legal, administrative, and other appropriate remedies to ensure enforcement of the constitutional and statutory rights of persons with disabilities.   42 U.S.C. §§ 10805(a)(1) and 15043(a)(2)(A) and (B).   In order to fulfill its duty to investigate and remedy instances of abuse and neglect of persons with disabilities, the Acts provide Advocacy with the express authority to access the records, as well as facilities and residents of the facilities who have developmental disabilities or mental illness, to ensure that the rights of these vulnerable populations are not violated.   42 U.S.C. §§ 10805(a)(4) and 15043(a)(2); *Robbins v. Budke*, 739 F. Supp. 1479, 1487 (D. N.M. 1990) (the P&A system's right of access to its clients is statutory).

Courts have uniformly held that the broad statutory authority of the Acts requires that P&A systems be permitted to operate effectively, and with broad discretion and independence in gaining access to facilities and records.[4] *Pennsylvania Protection and Advocacy v. Hammons*, 228 F.3d 423, 425 (3rd Cir. 2000); *Cotton,* 929 F.2d at 1058-59 ("The state cannot satisfy the requirements of [the

---

[4] *See also, Tarwater*, 97 F.3d at 492  (PADD Act); *Michigan Protection Advocacy Serv., Inc. v. Miller*, 849 F. Supp. 120 (W.D. Mich. 1994) (PADD Act); *Robbins*, 739 F.Supp. at 1479 (PAIMI Act); *Maryland Disability Law Ctr., Inc. v. Mt. Washington Pediatric Hosp., Inc.*, 664 A.2d 16 (Md. App. 1995) (PADD Act); *Cramer v. Chiles*, No.98-43-Misc.-T-26A (D. Fla. Sept. 1, 1998) (PADD Act).

PADD Act] by establishing a protection and advocacy system which has authority in theory, but then taking action which prevents the system from exercising that authority.").

**B.       Peer Review Records**

Peer review is a process by which committees of medical professionals investigate the care and treatments provided in order to determine whether accepted standards of care have been met, and make recommendations regarding necessary improvements to the systems of care. When a resident dies at a DADS state school a clinical death review committee must convene "to review the quality and appropriateness of medical care and other medically related services rendered prior to the death; and to recommend, when appropriate, changes in medically related policy and procedure, professional education, clinical operations, or patient care." 40 T.A.C. § 8.270(b).

The peer review records sought in this matter discuss the circumstances surrounding the deaths of two individuals who were residents at two of the DADS state school facilities, and potentially identify processes and systems requiring improvement and appropriate courses of action. Access to these records is crucial to Advocacy's federal mandates, as these records may provide extremely valuable information about resident care, treatment, and instances of abuse and neglect. Peer review program records can provide invaluable information on systemic treatment issues not available from any other source. Such documents can be used by the P&A to effectively advocate for necessary reforms to benefit the individual client involved and others as well. For instance, such records can reveal information on whether patients are receiving minimally adequate care and treatment, information about staffing levels, the quality and quantity of programming, and the overall safety of the environment, including measures to prevent suicides or improper restraint and seclusion. Moreover, P&As have a critical need for these records for the purpose of determining whether the peer review program itself is actually functioning.

Defendant's refusal to provide Advocacy with access to such records will continue to cause Advocacy, if its motion is not granted, irreparable harm. Specifically, Advocacy will be unable to fulfill its obligation to ensure that the rights of individuals with disabilities are protected.

**C.      Advocacy's Requests to DADS for Peer Review and Death Records**

As part of its federal duties under PADD, Advocacy spends considerable time and resources monitoring conditions at state-operated institutions, including DADS state school facilities. Commissioner Horn is responsible for the safe, efficient and effective operation of Texas state schools, and for ensuring that DADS and its policies are in compliance with federal laws and regulations including the PADD Act and the PAIMI Act.

R.G. was a ward of the state and committed to the Mexia State School ("Mexia SS"), a facility operated by DADS. He was only a resident of Mexia SS for a brief six months. However, during that time he was restrained approximately 60 times. The very last time he was restrained occurred on or about January 15, 2007. On this occasion R.G was restrained in a face down position for several minutes and then transferred to a restraint board where he lay in a face down position for fifteen additional minutes. He was not released from the papoose board until after Mexia SS staff determined that he was unresponsive. He was pronounced dead at the emergency room. The autopsy report states he died due to positional asphyxiation from restraint.

After obtaining knowledge of R.G.'s death, Advocacy initiated an investigation into his death to determine whether or not his death was a result of abuse and/or neglect by Mexia SS staff. Based on information and belief, a death review report, internal investigation, and/or peer review report have been completed regarding R.G.'s death by Mexia SS pursuant to DADS policy.

On April 5, 2007, Advocacy requested in writing that the Superintendent of Mexia SS provide Advocacy with all records and information related to R.G. during his commitment to the

Mexia SS, including all internal investigations, peer review and/or quality assurance records related to R.G.'s death. (*See* April 5, 2007 Letter to Mexia SS, attached as Exhibit B)  These documents are essential for Advocacy's statutorily authorized investigation into the facts surrounding R.G.'s death.

In response, the Superintendent of Mexia SS did provided documents related to R.G.'s care and treatment while committed at the Mexia SS; however, he did not provide Advocacy with internal investigation reports, peer review reports, and/or quality assurance reports related to R.G.'s death.

As a result of the denial of these investigation report documents, Advocacy is unable to complete its statutorily authorized investigation into the incident which caused R.G.'s death. Advocacy also is unable to determine if Mexia SS, and/or Defendant now require Mexia SS and its employees to take corrective measures in order to protect other state school residents.

A.P. was a resident in custody, care, and control of Corpus Christi State School ("Corpus Christi SS"), a facility operated by DADS.  Upon information and belief, on or about May 30, 2007, A.P. committed suicide by hanging herself with her shoelaces in her bedroom at Corpus Christi SS. There is indication that when Corpus Christi SS staff initially found her, that she was still alive. However, because Corpus Christi SS staff failed to implement emergency procedures, A.P. died.

After obtaining knowledge of A.P.'s death, Advocacy initiated an investigation into her death to determine whether or not A.P. died as a result of the abuse and/or neglect of Corpus Christi SS staff.  Based on information and belief, Corpus Christi SS, as required by DADS policy, completed a serious incident report and a death review report regarding A.P.'s death.

On July 10, 2007, Advocacy sent a written request seeking all investigative reports into the death of A.P. to the Superintendent of Corpus Christi SS.  (*See* July 10, 2007 Letter to Corpus Christi SS, attached as Exhibit C)  These documents are essential for Advocacy to meet its statutorily authorized mandate to investigate the facts surrounding A.P.'s death.

The Superintendent of Corpus Christi SS did not provide Advocacy with internal investigation reports, peer review reports, and/or quality assurance reports related to A.P.'s death.

As a result of the denial of these investigation report documents Advocacy is unable to complete its statutorily authorized investigation into the incident which caused A.P.'s death, and Advocacy is unable to determine if Corpus Christi SS, and/or Defendant has since required Corpus Christi SS and its employees to implement corrective measures in response to this incident so that other individuals with developmental disabilities do not suffer a similar fate.

On August 8, 2007, Advocacy made a written request to Defendant's in-house attorney, Kent Johnson, for any peer review reports related to R.G. and A.P.'s deaths. (*See* August 8, 2007 email to Kent Johnson, attached as Exhibit D) This written request also sought clarification and confirmation regarding the Defendant's policy, practice, or procedure regarding releasing peer review materials to Advocacy.  In support of its request, Advocacy had provided the Department with its statutory authority as well as case law, supporting the release of peer review materials.

On August 30, 2007, Mr. Johnson, after consulting with DADS, stated that it is the Department's position that it will not release any peer review documents to Advocacy, including the documents relating to R.G. and A.P.'s deaths. (*See* August 30, 2007 email from Kent Johnson, attached as Exhibit E).

The Defendant's Policy unduly restricts Advocacy from obtaining information and documents it is entitled to receive under federal law.  Furthermore, its policy impairs, limits, and impedes Advocacy's ability to conduct statutorily authorized investigations.

Defendant is responsible for implementing the Department's policy of denying Advocacy access to such records and documents.  Defendant's ongoing conduct of denying Advocacy access to serious incident reports, death review reports, peer review materials, and other internal

investigations, despite numerous oral and written requests by Advocacy to the Defendant, unduly

limits, impairs, and impedes Advocacy's ability to conduct its statutorily authorized investigations.

Thus, Advocacy, after exhausting all non-judicial avenues to gain these documents, filed the

present action seeking to maintain its statutory authority to access death review reports in order to

investigate the potential abuse and neglect of two residents.

## II. ARGUMENT AND AUTHORITIES

This Motion should be granted because Advocacy satisfies all the requirements for the

granting of a preliminary injunction.  For a preliminary injunction to issue, the moving party must

establish four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat

that failure to grant the injunction will result in irreparable injury; (3) the threatened injury outweighs

any damage that the injunction may cause the opposing party; and (4) the injunction will not disserve

the public interest. *Women's Med. Ctr. of Northwest Houston v. Bell,* 248 F.3d 411, 419 at n.15 (5th

Cir. 2001) citing *Hoover v. Morales,* 164 F.3d 221, 224 (5th Cir. 1998); *Clark v. Prichard,* 812 F.2d

991, 993 (5th Cir. 1987); see also *Lakedreams v. Taylor,* 932 F.2d 1103, 1107 (5th Cir. 1991).

It is not necessary for the moving party to satisfy each of these factors to the same degree;

rather, a court must use a "balancing-type approach in reviewing a preliminary injunction or TRO

application."[5]  When analyzing the degree of "success on the merits" necessary to justify injunctive

relief, the Fifth Circuit employs a sliding scale that involves balancing the hardships associated with

the issuance or denial of a preliminary injunction with the degree of likelihood of success on the

merits.[6]  In addition, the moving party must also show "that immediate and irreparable injury, loss,

---

[5] *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 180 (5th Cir. 1975).

[6] *See Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir. 1980). Indeed, a showing of some likelihood of success on the merits will justify temporary injunctive relief. *See Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel, Inc.,* 735 F.Supp. 1334 (S.D. Tex. 1986), *also see Cho v. Itco, Inc.,* 782 F.Supp. 1183, 1185 (E.D. Tex. 1991) and *Hooters, Inc. v. City of Texarkana, Tex.,* 897 F.Supp. 946, 949 (E.D. Tex. 1995).

or damage will result to the applicant" before opposition can be heard and a hearing held.[7] In this case, all of the factors necessary for this Court to issue a preliminary injunction have been met.

**A.     There Is A Substantial Likelihood That Advocacy Will Succeed On The Merits**

The question raised in this case is whether the PADD Act authorizes Advocacy to access peer review and death review reports when it is conducting an investigation into the alleged abuse or neglect of an individual with a disability. Since the unambiguous language of the PADD & PAIMI Acts, the underlying purpose of the PADD and PAIMI Acts, and court interpretations of the Acts, all indicate that a P&A system may have access to reports that assist it in investigating potential abuse and neglect into the death of a person with a disability, which includes peer review reports, there is a substantial likelihood that Advocacy will succeed on the merits. *See* 42 U.S.C. § 15043(a)(2)(I) & (J); 42 U.S.C.§ 10805(a)(4)(A), (B). Defendant has refused to provide these documents claiming that the PADD Act does not authorize disclosure of these documents.

1.   THE PLAIN LANGUAGE OF THE PADD ACT, UNEQUIVOCALLY REQUIRES DISCLOSURE OF PEER REVIEW AND DEATH REVIEW REPORTS OF PERSONS WITH DISABILITIES

When interpreting a statute courts should strive to ascertain the legislature's intent by looking to the plain language of the statute itself as it is presumed that Congress expresses its intent through the ordinary meaning of its language. *FMC Corp. v. Holliday*, 498 U.S. 52, 57 (1990), *quoting Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985)("[we] begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue."). The particular statutory language in question in this case is the phrase "records" as used in the PADD Act.

---

[7] FED. R. CIV. P. 65(b).

a. *The Phrase "All Records of Any Individual" Plainly Includes Peer Review and Death Review Reports and Investigations.*

Congress explicitly addressed the scope of the P&As' authority to secure records under the PADD Act when it specifically stated that:

> In order for a State to receive an allotment under part B of this subchapter or this part-
> (a) the state shall have in effect a system to protect and advocate the rights of individuals with developmental disabilities;
> (2) such system *shall*--
> (I) have access to *all records* of --
> (ii) any individual with a developmental disability, in a situation in which--
> (I) the individual, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access.

42 U.S.C. § 15043(a)(2)(I)(ii)(emphasis added). There is no dispute that R.G. and A.P. are by reason of their physical condition (death) unable to authorize Advocacy to have access. *See Tarwater*, 97 F.3d at 492, 497, n.2 (The court, applying the records access requirements of the PADD Act, concluded that deceased persons "are unable to authorize" release of records within the meaning of Section 6042(a)(2)(I)(ii)[8]). Additionally, section 15043(a)(2)(J)(ii)(II), added when the PADD statute was amended in 2000, expressly states that P&As are entitled "to the records without consent from another party" … "in any case of death of an individual with a developmental disability." 42 U.S.C. § 15043(a)(2)(J)(ii)(II). Therefore, the only issue is whether the peer review/death review reports for R.G. and A.P. are encompassed within the phrase "all records of any individual."

Of paramount importance in this inquiry is that Congress used the word "all" to describe the scope of the P&As' authority to access client records.[9] "All" means "the entire or total number, amount, or quantity" of records. *The American Heritage Dictionary of the English Language, Fourth Edition* (Houghton Mifflin Company 2004), http://dictionary.reference.com/browse/all. *See also*

---

[8] Section 6042(a)(2)(I)(ii) of the PADD Act is the predecessor (pre-2000) section to 42 U.S.C. § 15043(a)(2)(I)(ii)).

*Bollman Hat Co. v. Root*, 112 F.3d 113, 116 (3rd Cir. 1997) (interpreting ERISA plan, court noted that "all" means "the whole of" or "every"), *cert. denied*, 522 U.S. 952 (1997).  Thus, Congressional use of the word "all" to describe the scope of the P&As' authority to access records plainly evinces its intent that P&As have access to *all* records that may be relevant to the investigation of potential abuse and neglect, discrimination, or constitutional violations.

The issue then is whether peer review records are within the scope and definition of "all records."

      *b.  Definition of Records*

        i.   <u>The PADD and PAIMI Acts Provide a Definition of "Records"</u>

The PADD and PAIMI Acts also provide guidance on the types of records which should be included in the term records that protection and advocacy systems may access, when it states:

> In this section, the term "record" *includes*:
> (1) a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities;
> (2) a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents; and
> (3) a discharge planning record.

42 U.S.C. § 15043(c).  Clearly, the plain language of the statute states that P&A access is not limited to those documents expressly enumerated in the statutory definition of "records."   The statute contains the word "includes" in the definition.  Thus, the list that follows is *not* exhaustive; instead, the list is an example of some, but not all, of what is considered within the definition.  *See American Surety Co. v. Marotta*, 287 U.S. 513, 517 (1933); *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206-07 (5th Cir. 1996)("'including'…is generally given an *expansive* reading, even

---

[9] It is also well-settled that "words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metropolitan Educ. Enterprises, Inc.*, 519 U.S. 202, 207 (1997) (citation omitted).  Furthermore, a dictionary is the "principle source for ascertaining the ordinary meaning of statutory language." *Thompson v. Goetzmann,* 337 F.3d 489, 498 n. 20 (5th Cir. 2003).

without the additional if not redundant language of 'without limitation'"); *Iowa Protection and Advocacy Services, Inc. v. Rasmussen*, 206 F.R.D. 630, 637 (S.D. Iowa 2001) (the words "but not be limited to" in the regulations prescribing the P&A's access to records "in no way intends to limit what a protection and advocacy system is entitled to under the statute"). Therefore, Section 15043(c) amplifies and describes what kinds of records must be included in those records to which a P&A has access, but in no way limits the types of records Advocacy may access.

        ii.   <u>Peer Review and Death Review Reports fall squarely within the types of records described in Section 15043(c).</u>

Peer review and death review reports certainly constitute "records" in the ordinary sense of the term, and they also fall squarely within the definition provided in Section 15043(c) of the Act. Section 15043(c), added when the PADD statute was amended in 2000, entitles Advocacy to have access to "a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities."

Each state school is required to maintain a clinical death review committee which shall be a medical and administrative peer review body comprised of staff at the state school. *See* 40 T.A.C. §§ 8.261-8.279. The clinical death review committee must review deaths that occur at each facility, the quality of care delivered prior to each death; and prepare a report. *Id.* It is also well established that state schools *are in the business of providing services and assistance* to persons with disabilities. In fact, they have no other function. Therefore, any report, including peer review and death review reports, prepared by the state school staff into R.G. and A.P. deaths incontrovertibly fall within Section 15043(c)(1)'s description of the type of records Advocacy is entitled to access. Whether Congress anticipated inclusion of such documents under PADD is irrelevant. "[T]he fact that a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate

ambiguity. It demonstrates breadth.'" *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted).

The reports in question here also fall within Section 15043(c)(2), "a report prepared by an agency or staff person charged with investigating reports of incidents of death occurring at such location where services, supports, or other assistance is provided." As discussed above, each state school in accordance with DADS' policies is *"charged with investigating reports of incidents of death occurring at such location."* *See* 40 T.A.C. §§ 8.261-8.279. The peer review and death review committees are composed of state school staff and it is the committees that write the reports. *Id.* Therefore, any report prepared by the death review and/or peer review committees into R.G. and A.P.'s deaths also falls within Section 15043(c)(2)'s description of the type of records Advocacy is entitled to access.

2.  CASE LAW

Every Federal Court to address whether the access authority of P&A's extends to peer review and state investigatory documents has held that the P&A Acts do allow access to peer review documents.[10] Of particular note, and which all of the other cases essentially follow is *Pennsylvania Protection & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 427-28 (3rd Cir. 2000). (then Judge, now Associate Supreme Court Justice Samuel Anthony Alito, Jr., wrote the opinion for the unanimous 3rd Circuit panel), which held that peer review documents clearly are "all records of any individual" and allowed their disclosure to the P&A. *Houstoun*, 228 F.3d at 427-28.

The *Houstoun* case involved the Pennsylvania P&A's attempt to access peer review records

---

[10] See *Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction Services*, 448 F.3d 119 (2nd Cir. 2006), *Missouri Protection and Advocacy Services v. Missouri Department of Mental Health*, No. 05-1780/3303, (8th Cir. May 10, 2006), *Disability Rights Wisconsin v. Wisconsin Dept. of Public Instruction*, 463 F.3d 719 (7th Cir. 2006), *Hammons*, 323 F.3d at 1262, *Rasmussen*, 206 F.R.D. at 630, *Houstoun*, 228 F.3d at 427-28.

concerning the suicide of a resident at a state psychiatric hospital.[11] *Id* at 426. The state refused to release the records claiming the records were protected under the state's peer review statute. *Houstoun*, 228 F.3d at 426. The Third Circuit, looking to the plain language of the statute, held that "[t]he peer review reports certainly constitute "records" in the ordinary sense of the term, and they also fall squarely within the definition provided in Section 10806…" *Id*. The Court determined that the plain language of the definition of "records" cited in the PAIMI Act encompasses peer review reports since they are clearly reports prepared by …"staff of a facility rendering care and treatment." *Id*. The court went on to explain that the defendant hospital was such a facility, and the reports were prepared by committees composed of members of the hospital's staff. *Id*. It also went on to note that the peer review reports may also constitute "reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility…" 42 U.S.C. § 10806(b)(3)(A).[12] The court rejected assertions that: (1) only incident reports are covered by the term "records" and that (2) in any case, the records cannot be disclosable because they are the hospital's property, and not the "records of any individual" *Id*. at 426-27.

### a. Cases Apply with Equal Force to the PADD Act

Although the *Houstoun* case interpreted the "records" provision under the PAIMI Act, the reasoning and holding in *Houstoun*, as well as the other investigation report cases which interpreted the PADD Act, should apply with equal force in this case. The PADD Act is the counterpart to the PAIMI Act for individuals with developmental disabilities. The PAIMI and PADD Acts are parallel

---

[11]*Houstoun, Hammons*, and *Mental Health & Addiction Services*, interpreted the PAIMI Act, which also contains the phrase "all records of any individual." *See* 42 U.S.C. § 10805(a)(4)(A).

[12] The court found that "peer review reports plainly describe, at a minimum, an "incident[ ] of … injury," namely, a suicide attempt, "and the steps taken to investigate such [an] incident[ ]." *Id.* Moreover, the peer review committees were indisputably "charged with investigating [a] report [ ] of [an] incident[ ] of abuse, neglect, [or] injury occurring at [the] facility." *Id.* The only reason the court did not rely on this provision in allowing access to peer review documents was because it found it debatable as to whether "these committees composed of hospital staff are "agencies" within the meaning of the statutory definition." *Houston,* 228 F.3d at 426, n.2. However, under the PADD Act, the statutory definition includes "a report prepared by an agency *or staff person*" 42 U.S.C. 10503(c)(emphasis added).

systems of protection and advocacy and differ only in the population they are designed to serve. Courts have frequently turned to the provisions of one Act to explain the other.  In *Advocacy, Inc. v. Tarrant County Hospital District*, 2001 WL 1297688, n.4 (N.D. Tex 2001), the court stated that "[i]n enacting [PAIMI] Congress extended the same protections to people with mental illness [as under the PADD Act]" and noted that "the acts are nearly identical and further the same goal– protecting the rights of vulnerable individuals..."[13]

Access to peer review records is just as essential for an effective system for protecting and advocating the rights of individual with developmental disabilities under the PADD Act as it is for individuals with mental illness under the PAIMI Act; therefore, the Acts should be construed in like manner.  Indeed, the PAIMI Act "record" provision considered in *Houstoun* and the PADD Act "records" provisions almost mirror each other.  The only difference between the two provisions is that the PAIMI Act limits its application to reports prepared by staff *"of a facility,"* whereas the PADD Act provision being considered in this case broadens its scope to include reports prepared *"by any staff at any location."*  Compare 42 U.S.C. § 15043(c) with 42 U.S.C. § 10806(b)(3)(A).

Furthermore, the PADD Act even further broadens the scope of documents to which P & A's are entitled.  For example, the subsection following the PADD records provision, 42 U.S.C. § 15043(a)(2)(J), states that the protection and advocacy system shall "have access to the records of individuals described" in subparagraph (I) and "other records that are relevant to conducting an investigation."  And in 42 U.S.C. § 15043(a)(3) the PADD Act requires States to provide the P&A's with "a copy of each independent review, pursuant to section 1396a(a)(30)(C) of this title, of an

---

[13] *See e.g. Allen*, 197 F.R.D. at 692 (explaining that the PADD Act directs each state to authorize a system to investigate reports of abuse and neglect of people with developmental disabilities, and that the same protections were extended to people with mental illness under the PAIMI Act. in 1986); *Iowa Prot. & Advocacy Services v. Gerard Treatment Programs, L.L.C.,* 152 F.Supp.2d 1150, 1166 (N.D. Iowa 2001)(incorporation of provision identical to that in PADD Act into PAIMI Act supported conclusion that PAIMI Act intended to permit P&A same access to records as permitted under PADD Act); *Advocacy Center v. Stadler*, 128 F.Supp.2d 358, 360 n.2 (M.D. La. 1999)("case law under the DD Act is helpful to the court in determining the right to access under the [PAIMI] Act.").

Intermediate Care Facility (Mental Retardation) within the State, not later than 30 days after the availability of such a review." Clearly, death review reports which describe the quality and appropriateness of medical care prior to a resident's death is "relevant to conducting an investigation" and are an independent review under § 1396a(a)(30)(C). Therefore, not only do peer review/death review reports fall under the records provision of the PADD Act, they also fall within §§ 15043(a)(2)(5) and (a)(3) of the PADD Act.

This was the finding in *Rasmussen*, where the court issued a permanent injunction barring the Iowa state survey and certification agency from denying the P&A access (under the PAIMI and PADD Acts) to its investigative findings regarding a restraint-related death of a resident at a facility serving persons with mental retardation. The court, looking to the plain language of the PADD Act held that "the statute itself provides clear authority to Iowa P & A to have access to records of an investigation regardless of the agency's internal findings of abuse or neglect." *Rasmussen* 206 F.R.D. at 638. The court also indicated that even if it had determined that the records provision of the PADD Act did not allow the Iowa P&A to access state regulatory agency investigations (which it did not find), § 15043(a)(3)(a) -- which requires States to provide P&As with access to independent reviews -- would probably allow access to such investigations. *Id. See also Disability Rights Wisconsin Inc.,* 463 F.3d at 727-729.

Similar to the P&A in *Houstoun* and *Rasmussen*, Advocacy is seeking the records of patients who died in DADS' facilities that render care and treatment. Additionally, staff of Mexia SS and Corpus Christi SS conducted an independent review of these deaths. Finally, the respective review committees included State School staff. Accordingly, Mexia SS and Corpus Christi SS peer review/death review documents developed in response to R.G. and A.P.'s deaths fall well within the meaning of "all records" of the client, are "relevant to conducting an investigation," and are "an independent review" and obtainable by Advocacy. Moreover, since death review records may

involve the evaluation of an incidence of abuse and neglect, these records are precisely the types of records that are necessary for P&As to carry out their mandate to investigate suspected incidents of abuse and neglect.

### 3. NEITHER STATE LAW NOR THE P&A ACT'S REGULATIONS BAR ADVOCACY'S ACCESS TO PEER REVIEW RECORDS

*Houstoun* also determined that neither Pennsylvania's peer review statute nor any other laws restricted the disclosure of peer review reports to the P&A. *Houstoun*, 228 F.3d at 423-29.   The Court rejected the defendants arguments that the Federal Regulations and legislative history created an exception for peer review records thus barring a P&A's access to peer review records and that the Federal Acts do not preempt State laws prohibiting disclosure.

### a.  Subsequent Federal Regulations and Legislative History Do Not Bar a P&A's Access to Peer Review Records

The *Houstoun* court did not find that the PAIMI regulation and legislative history issued subsequent to the enactment of PAIMI supported defendant's contention that PAIMI creates a privilege for peer review records. *Id*. at 427.   In deciding whether an administrative regulation correctly interprets the statute it is charged with enforcing, the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) held that a court must first examine whether Congress directly addressed the question at issue.  If Congressional intent is clear then no further inquiry is required.  However, if Congress has not addressed the issue in question, or if Congress is silent or ambiguous on the issue, the court must decide whether the agency's answer is a correct interpretation of the statute. *Id.* at 843-44.

Both the PAIMI Act and the PADD Act regulations have a provision which states that "nothing in this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees." 42 C.F.R. § 51.41(c)(4)(PAIMI) and 45 C.F.R.§ 1386.22(c)(1)(PADD).  With respect to whether 42 C.F.R. § 51.41(c)(4) validly construes Congress'

intent regarding PAIMI, the Third Circuit applied the *Chevron* standards. *Houstoun* 228 F.3d at 427-28. The Court reasoned that the statutory language either includes peer review records or it does not. "The statutory language cannot be reasonably construed to encompass identical peer review reports in some states but not in others. *Houstoun* 228 F.3d at 428. The Court further reasoned that if Congress wished this result, it would have enacted different statutory language but could not achieve such a result "in the face of the statutory language it enacted … by means of a regulation." *Id.* at 428. Hence, "[t]he interpretation of PAIMI set out in 42 C.F.R. § 51.41(c)(4) does not represent a reasonable interpretation of the statute, and we must therefore reject it." *Id.* at 427-28, accord *Chevron*, 467 U.S. at 843-44. The Court also gave no weight to the legislative history surrounding the PAIMI Act which states that the Act should not be interpreted as preempting state laws regarding disclosure of peer review records.[14]

   As indicated in *Houstoun* the PADD Act "records" provision, like the PAIMI Act, clearly authorizes access to peer review documents. Congress intended for P&As to have access to all records including peer review records. Since Congress has not changed its position on records access by enacting statutory language creating an exception for peer review records, it cannot achieve such a result "simply by inserting a passage into a committee report." *Houstoun* 228 F.3d at 428. Additionally, there is no mention of peer review reports in the PADD Act's accompanying legislative history, nor anything suggesting that peer review records should not be included in the documents

---

[14] The legislative history cited and relied on by the defendants in *Houstoun* states that "[i]t is the Committee's intent that the PAIMI Act does not preempt State law regarding disclosure of peer review records relating to the proceedings of such committees." *Houstoun*, 228 F.3d at 427, citing H.R. Rep. No. 102-319, *reprinted in* 1991 U.S.C.C.A.N. 777, 782. This House Report accompanied the re-authorization of PAIMI when the appropriations for PAIMI had expired in 1991 and were re-authorized that year. *Houstoun*, 228 F.3d at 427. The Third Circuit first noted that when PAIMI was first enacted in 1986 there was no mention of peer review reports in the accompanying legislative history. *Id.* The first time peer review was mentioned was in 1991 in the legislative history cited above. However, when Congress re-authorized PAIMI in 1991, it did not change the record access language in 42 U.S.C. §§ 10805(a)(4)(A), (B), and 10806(b)(3)(A).

P&As are entitled to access.  Therefore, the PADD regulation, 45 C.F.R. § 1386.22(c)(1), "does not represent a reasonable interpretation of the statute," and it should be rejected. *Id.* at 427-28.

> b.   *PADD is Consistent with Texas' Peer Review Statutes, but to the Extent that it is Found to be Inconsistent, PADD Preempts Texas State Law*

The *Houston* court held that the PAIMI Act clearly preempts "any state law that gives a healthcare facility the right to withhold" peer review reports. *Houstoun*, 228 F.3d at 428.  However, the court concluded that there was no conflict between the state law in issue and federal law because the P&A sought the peer review records as part of a statutorily authorized investigation and not as a means of discovery or to introduce them in a civil action. *Id.*  The Third Circuit looking again to the plain meaning of the statute,[15] found that nothing in the state statute supported the defendants' contention that peer review records must be kept confidential from an advocacy agency like a P&A. *Houstoun*, 228 F.3d at 428.  The Court found it important that PAIMI, pursuant to 42 U.S.C. § 10806(a), imposed a duty of confidentiality on P&As to the same extent as is required of the provider. *Id.* Section 10806(a) provides:

> An eligible system which, pursuant to [PAIMI], has access to records which, under … State law, are required to be maintained in a confidential manner by a provider of mental health services, *shall*, except as provided in subsection (b) of this section, *maintain the confidentiality of such records to the same extent as is required of the provider of such services*. (Emphasis added).

"Thus, the intent of the legislature, as revealed by the plain language of [the statute] and confirmed by legislative history, was to prevent the disclosure of peer review information to outside parties seeking to hold professional health care providers liable for negligence ..."*Id.*  Therefore, defendants' claim of confidentiality could not be a bar to disclosure of the records. *Id*, at 428-29.

---

[15] The court looked to Pennsylvania's peer review statute which states: "[t]he proceedings and records of a review committee shall be *held in confidence*…" Pa. Cons. Stat. § 425.4.

i.   <u>There is No Conflict Between the PADD Acts and Texas Peer Review and Medical Review Statutes.</u>

The plain language of the PADD act also places an obligation on Advocacy to maintain the confidentiality of any records it obtains:

> The client's record is the property of the Protection and Advocacy System which must protect it from loss, damage, tampering, or use by unauthorized individuals.  The Protection and Advocacy System must: keep confidential all information contained in a client's records, which includes, but is not limited to, information contained in an automated data bank.  This regulation does not limit access by parents or legal guardians of minors unless prohibited by State or Federal law, court order or the rules of attorney-client privilege.

45 C.F.R. § 1386.22(e)(1); *Disability Rights Wisconsin, Inc.,* 463 F.3d at 729("Both the PADD Act and the PAIR Act bar P&A agencies from disclosing information obtained from client records to unauthorized parties.").  The Act's design thus reflects a careful balance between, on the one hand, concerns about confidentiality and conflicts with state laws, and, on the other hand, the need for P&As to access all materials to fulfill their mission.

Texas peer review and medical review statutes also reflect the necessity to disclose peer review and medical review reports to certain entities, including Advocacy.  These statutes state that, "[a] record or proceeding of a medical peer review committee or a written or oral communication made to the committee *may be disclosed to ...an appropriate state or federal agency...*"[16] and that "[t]he protection and advocacy system shall have access to records as required by the provisions of the applicable federal disability laws."[17]  Additionally, DADS too is of the belief that Advocacy may access peer review materials to fulfill its mission, as it adopted a regulation which explicitly allows Advocacy to access peer review and death review documents.  *See*  40 T.A.C. § 7.511(Under the *Confidentiality of Investigative Process and Report* section of the regulation it indicates that

---

[16] TEX. OCC. CODE § 160.007(c)(2)(emphasis added).

[17] TEX. HUM. RES. CODE ANN. § 112.021.

Advocacy is entitled to access the records of the (alleged) victim to the extent allowed and required by the PADD and PAIMI Acts).

Finally, like Pennsylvania's statutes, an underlying goal of the Texas peer review statutes is the ability of medical professionals to candidly assess their peers without the fear of civil liability. *See Mem'l Hosp. - The Woodlands v. Mccown*, 927 S.W.2d 7, 11 (Tex. 1996). Advocacy's requests for R.G. and A.P.'s peer review records were not initiated by a civil action, but rather as part of its investigative duty. It follows then that Advocacy's investigation is not a civil action and as such does not conflict with the peer review statute and does not fall within its disclosure prohibition. Since (1) the PADD Act requires advocacy organizations like Advocacy to maintain the confidentiality of peer review reports; (2) Texas peer review statute allows for disclosure of these reports to Advocacy; and (3) Advocacy is intending to use the reports in order to meet its statutory duty of investigating abuse and neglect, and not for civil litigation, there is no conflict between state and federal law. Therefore, Advocacy is not precluded by the Texas peer review statute from accessing these documents.

        ii.  <u>Even if There is a Conflict, the PADD Act Preempts Texas Peer Review and Medical Review Statutes.</u>

The PADD Act preempts the Texas peer review and medical review statutes by virtue of the Supremacy Clause of the United States Constitution.[18] Under the Supremacy Clause federal law preempts state law when Congress expressly states that state law is preempted, or state law conflicts with federal law or its purposes. *AT&T Corp. v. Public Util. Comm'n of Tex.,* 373 F.3d 641, 645 (5th Cir. 2004). Conflict preemption under the Supremacy Clause "arises when 'compliance with both federal and state regulations is a physical impossibility,' ... where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[,]'" *Pac. Gas &*

*Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 204, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983) see also *Wells Fargo Bank of Tex. NA v. James,* 321 F.3d 488, 491 n.3 (5th Cir. 2003). In this case, preemption exists because Congress expressly preempted state law, and Texas peer review and medical review statutes would frustrate the purposes of Congress in passing the PADD Act. So, even if this Court were to find no consistency between PADD and Texas State law, Federal law is clear that PADD preempts all state policies and laws that conflict with the PADD Act.

Congress, under section 10806(b)(2)(C),[19] expressly declared that after May 23, 1986 the PAIMI Act preempts state law. *See Houstoun,* 228 F.3d at 428, accord *Stalder,* 128 F.Supp. 2d at 367; *Oklahoma Disability Law Center v. Dillion Family and Youth Services,* 879 F. Supp. 1110 (N.D. Oka. 1995); *Rasmussen,* 206 F.R.D. at 639. It is clear that Congress intended that the PAIMI and PADD Acts be applied in a consistent manner; accordingly, the preemption provision in the PAIMI Act is equally applicable to the PADD Act. A similar finding was made in *Tarwater,* a case where the court indicated that since the PAIMI Act does expressly authorize P&As to access the records of deceased persons, P&As may access records of deceased persons under the PADD Act despite the fact that such authority was not expressly spelled out in the PADD Act itself. In *Tarwater,* the defendant tried to assert that since PAIMI, but not PADD, expressly provides for access to the records of "an individual who has died", that Congress did not intend for P&As to access deceased records under the PADD Act. The court rejected this argument holding that "[t]here is no evidence that the lack of this language in the Developmental Disabilities Act implies that Congress meant to exclude death from that Act's record access provisions…. Further, what evidence

---

[18] "This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby ...." U.S. CONST., art. VI, cl. 2.

[19] 42 U.S.C. § 10806(b)(2)(C) provides: "[I]f the laws of a State prohibit an eligible system from obtaining access to the records of individuals with mental illness in accordance with section 10805(a)(4)… and this section 10805(a)(4) shall not apply to such systems before …the expiration of the 2-year period beginning on May 23, 1986…"

there is, points in the direction of including death in the Developmental Disabilities Act's records access provisions.  To begin with, legislative history suggests that the record access provisions of the two acts are meant to be "consistent."" S. Rep. No. 100-113, 1st Sess. at 24 (1987), *reprinted in* 1987 U.S.C.C.A.N. 781, 803-04....*Tarwater*, 894 F. Supp. at 428. *See also* discussion *supra* Part II.A.2.a.

Regardless of whether the PADD Act expressly preempts state law, all courts that have considered whether the P&A Acts preempt state laws have held that state law restrictions on release of individual records are preempted as such restrictions pose an obstacle to P&A access authority.[20]

> In the case of both the PAIMI Act and the PADD Act, it is clear that Congress has, indeed, "occupied the field," with respect to the investigatory powers and rules of disclosure regarding protection and advocacy systems for dependent adults.  The statutory and regulatory scheme would not make sense any other way.  Protection and advocacy systems are established as independent checks on state care and regulation of care for dependent adults.  That independent check would become meaningless if a state was allowed to simply legislate away a protection and advocacy system's power to investigate by enacting restrictions.

*Rasmussen*, 206 F.R.D. at 639.   With respect to disclosure of peer review and investigatory information under the PADD Act, Congress has indeed, 'occupied the field.'  The PADD Act requires Advocacy to "have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities." 42 U.S.C. § 15043(a)(2)(B).  To ensure that the PADD Act's mandate can be effectively pursued, the PADD Act requires state agencies, such as DADS, to provide Advocacy with access to "independent review[s]" and "report[s] prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury or death..." 42

---

[20] *See, e.g., Protection and Advocacy for Persons with Disabilities, State of Cts,* 448 F.3d at 129 (in peer review records case, the court stated that "to the extent there is a conflict [between state law and the PAIMI Act], PAIMI governs"); *Houstoun,* 228 F. 3rd 423 (PAIMI Act preempts state statute protecting confidentiality of peer review records); *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski,* 131 F.Supp.2d 1039 (E.D. Wis. 2001) (preemption of state laws that might apply to nursing home records); *Rasmussen,* 206 F.R.D. 630 (ordering disclosure to the P&A under PADD of investigative report of the state licensing and certification agency despite state law prohibiting such release); *Okla. Disability Law Ctr., Inc.,* 879 F.Supp. at 1112 (PAIMI Act preempts state law permitting disclosure of psychiatric records only with a court order); *Stalder,* 128 F.Supp. 2d 358 (state law regarding inmates' records).

U.S.C. §§ 15043(a)(3) and 15043(c).  Thus, if Texas state law prevented disclosure of these documents to Advocacy it would, in effect, impede its ability to investigate a claim, and its authority to investigate would mean nothing.  And, as indicated in *Cotton*, "[t]he Act ...states that the systems **must have the authority** to perform these services.  The state cannot satisfy the requirements of the [PADD Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority." *Cotton*, 929 F.2d at 1058-59 (emphasis in original).  Therefore, to the extent that the Texas peer review or medical review statutes prohibit Advocacy from obtaining these records, it is preempted by federal law, as any other reading "would attribute to Congress an intent to pass an ineffective law." *Tarwater*, 894 F.Supp. at 429.

In the present case, the Defendant has denied Plaintiff full access to R.G.'s records for more than ten months, and has also denied Plaintiff access to A.P.'s records.  Defendant has consistently denied Advocacy's requests for records on the basis that the state peer review statute protects the records.  Defendant's denial violates PADD and continues to violate Plaintiff's statutory right to access R.G. and A.P.'s records in pursuit of its statutory duty to investigate suspected incidents of abuse or neglect.  Because Advocacy has a statutory right to fully access the requested records and the Defendant continues to thwart Advocacy's rights, there is a substantial likelihood that Advocacy will succeed on the merits of its case.

**B.     Advocacy Will Be Irreparably Harmed in The Absence of Injunctive Relief**

To satisfy the likelihood of irreparable injury prong, a plaintiff only needs to "establish that at the time of the injunction it was under a substantial . . . 'threat of harm which cannot be undone' . . . through monetary remedies."[21]

---

[21] *See Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981) (citing *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975).

Every court to examine the issue has held that a P&A suffers irreparable harm, and is thus entitled to preliminary and permanent injunctions, when it is denied access to persons and documentation that it needs to monitor and conduct a complete investigation.[22] In *Czaplewski*, the plaintiff successfully argued that the defendant's refusal to provide records to which the plaintiff was entitled, frustrated its ability to carry out its mandate to investigate abuse and neglect. *Czaplewski*, 131 F. Supp.2d at 1050. The court in *Czaplewski* cited to a variety of specific harms to its ability to conduct a timely investigation. For example, loss of memory inevitably occurs with the passage of time and witnesses may become inaccessible as a result of relocation or death. Also, as a direct result of the defendant's refusal to provide access to records, potential claims may be lost. *Id.* at 1050-51. "Perhaps most importantly, the residents on whose behalf it must act bear the risk of injury or death." *Id.* at 1051. The court was persuaded that,

> the defendant's refusal to provide [the P&A] with records that it is entitled to review (indeed, charged to review as a part of its responsibilities) does, in a very real and readily identifiable way, pose a threat to the [P&A's] being able to discharge its obligation.

*Id.*

Unless DADS is enjoined from refusing Advocacy access to the peer review/death review reports, Advocacy will be unable to carry out its statutory obligation to fully investigate these two deaths. Congress intended that Texas, like other states, have an "effective" P&A system, not simply a pro forma organization which has the theoretical power to investigate cases of possible abuse and neglect but no effective way to carry out those investigations. *See Cotton.*, 929 F.2d at 1054. If this Court denies Advocacy's Motion, Advocacy will be irreparably harmed in ways reaching far beyond this case, as its ability to carry out future investigations and ferret out abuse and neglect, would be

---

[22] *See, e.g., Tarwater*, 97 F.3d 492; *Houstoun*, 228 F.3d at 423; *Cotton*, 929 F.2d 1054; *Armstrong*, 266 F.Supp.2d 303; *Allen*, 197 F.R.D. 689; *Georgia Advocacy Office v. Borison*, 238 Ga.App. 780 (1999). *Czaplewski*, 131 F.Supp.2d at 1039 (E.D. Wis. 2001), *Salder*, 128 F.Supp.2d 358, *Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F.Supp.2d 1150 (N.D.Iowa 2001); *Rasmussen*, 206 F.R.D. at 630.

severely compromised.    Advocacy will be hampered in determining how and why these two individuals died and in identifying steps that can and should be taken to address any systemic issues raised by their deaths.    The documents that Advocacy is being prevented from reviewing - peer review documents - reflect the professionals' own assessments and will go far toward aiding Advocacy in its investigation and in its ability to advocate for reform.    Thus, Advocacy has been irreparably harmed, and will continue to be irreparably harmed until this Motion is granted because it is prevented from accessing documents in furtherance of its duty to investigate complaints of abuse or neglect.

C.    **The Threatened Injury Outweighs any Damage That The Injunction May Cause DADS**

Conversely, if Advocacy's Motion for Preliminary Injunction is granted, DADS will merely be required to do that which the law requires. *Czaplewski*, 131 F.Supp.2d at 1052; *Gerard Treatment Programs,* 152 F.Supp.2d at 1150, 1174; *Stadler*, 128 F.Supp.2d 358 at 368.

The balance of the equities in this case plainly weighs in favor of the issuance of a preliminary injunction, which would restore Advocacy's mandated obligation to investigate abuse and neglect.    The issues raised by DADS restriction of Advocacy's access goes to the very heart of the P&A systems – "to protect the human and civil rights" of persons with disabilities, "this most vulnerable population." *Tarwater*, 97 F.3d at 494.    Absent an injunction, Advocacy's vital role in ensuring that the rights of individuals with disabilities are protected will be thwarted.

D.    **An Injunction Will Not Disserve the Public Interest**

Rather than disserve the public interest, an injunction will, in fact, advance the public interest in protecting the legal and human rights of our most vulnerable citizens.    That was the intent and purpose of the PADD and PAIMI Acts, and it is that intent and purpose Advocacy seeks to protect through the issuance of an injunction in this case.    Granting Advocacy's Motion will fulfill

Congress' intent that Advocacy has an effective P&A system.  Similarly, granting Advocacy's Motion will further the public's interest in eliminating the mistreatment of persons with disabilities, by allowing Advocacy to do that which it was enacted to do-- investigate incidents of abuse or neglect and advocate and protect the legal rights of individuals with disabilities.

### III.  CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court issue a preliminary injunction and thereafter a permanent injunction enjoining the Defendant from continuing to refuse Plaintiff access to all the records, including peer review and death review records, of R.G. and A.P., in pursuit of its statutory obligation to investigate suspected incidents of abuse and neglect.  Furthermore, the court should enjoin the Defendant from engaging in similar acts in the future and order the Defendant to immediately give Plaintiff full access to the records requested.

Dated:  January 23, 2008.


Respectfully submitted,



BETH MITCHELL
State Bar No. 00784613

ADVOCACY, INCORPORATED
7800 Shoal Creek Boulevard, Suite 171-E
Austin, Texas 78757-1024
(512) 454-4816 (Phone)
(512) 323-0902 (Fax)

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF CONFERENCE

This Motion for Preliminary Injunction and Memorandum of Support has been filed concurrently with Plaintiff's Verified Original Complaint. The Defendant has not answered the Complaint and Plaintiff is unaware of who the Defendant's attorney of record will be, and therefore, was unable confer with Defendant's counsel.

Beth Mitchell

## CERTIFICATE OF SERVICE

I hereby certify that on this 23 day of January, 2008, a true and correct copy of the foregoing document was provided to a process server to serve via summons with the Plaintiff's Verified Original Complaint, on ADELAIDE HORN, Commissioner of the Texas Department of Aging and Disability Services, Defendant. Plaintiff was unable to serve this document on the Defendants' attorney of record as this Motion for Preliminary Injunction and Memorandum of Support has been filed concurrently with Plaintiff's Verified Original Complaint. The Defendants have not answered the Complaint and Plaintiff is unaware of who the Defendants' attorney of record will be, and therefore, Plaintiff is serving this Motion on

Beth Mitchell